**Henry Martinez PORTER, Petitioner-Appellant,**

v.

**W.J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellee.**

No. 82–2499.

United States Court of Appeals, Fifth Circuit.

July 18, 1983.

Rehearing and Rehearing En Banc Denied Aug. 31, 1983.

Douglas Tinker, Corpus Christi, Tex., A. Deniz Tor, Gelberg & Abrams, John A. Herfort, Andrea G. Hirsch, Edward M. Chikofsky, New York City, for petitioner-appellant.

Mark White, Atty. Gen., Leslie A. Benitez, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RUBIN and TATE, Circuit Judges, and STAGG *, District Judge.

TATE, Circuit Judge:

This is an appeal from the district court's denial, without an evidentiary hearing, of the petition of Henry Porter, a Texas prisoner, for a writ of habeas corpus, 28 U.S.C. § 2254, with respect to his conviction for capital murder and the imposition of the death penalty. This federal habeas application asserts that certain errors of constitutional dimensions occurred during the 1979 state trial of Porter that resulted in his conviction and death penalty, which was affirmed at *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982).[1]

On the present appeal, Porter contends that the district court erred in failing to afford him habeas relief, or at least an evidentiary hearing, because under the showing made the conduct of the trial in the Texas state court had deprived him of various constitutional rights due to: (1) the exclusion of venirepersons who were only equivocally opposed to the death penalty; (2) the rejection of the defendant's request for a psychiatric examination to determine his competency to stand trial because the defendant had insisted that the results of the examination be barred from the penalty hearing; (3) the admission of extrinsic offense testimony by his victim in a prior crime; (4) the introduction of evidence of an alleged oral confession by the defendant; and (5) the prosecution's reference in closing argument to the fact that Porter's out-of-court exculpatory written statements were not made under oath, an alleged comment upon his failure to testify. Finding no reversible merit in these contentions, we affirm the dismissal of the petitioner Porter's habeas petition.

We shall first discuss *I.* the Juror-Exclusion and *II.* the Competency Psychiatric Examination issues, before setting forth the factual context in which the other three contentions of error in the guilt/innocence trial arises: *III.* Evidentiary Objections: *A.* Introduction of an Extrinsic Offense and *B.* Introduction of an Oral Confession; and *IV.* the Prosecutor's Alleged Comment upon the Accused's Failure to Testify.

## I. *Juror Exclusion*

Porter contends that six prospective jurors were disqualified from serving in his

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. This was a second trial for the offense. An initial conviction and death sentence at a 1976 trial had been reversed on appeal. *Porter v. State,* 578 S.W.2d 742 (Tex.Cr.App.1979). The reversal was based upon the admission over objection at the penalty hearing (as denying confrontation rights) of letters, reports, and documents from a federal parole officer's file that reported a serious narcotic addiction and a number of serious mental and emotional handicaps that indicated poor possibilities of rehabilitation. 578 S.W.2d at 745. Among other things, these exhibits referred to Porter's "aggressive nature" and psychological reports that he had "a psychopathic personality" and "indications of paranoid schizophrenic behavior." 578 S.W.2d at 744.

trial, in violation of the principles enunciated in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Supreme Court there held that the state may not exclude venirepersons from jury service in capital cases unless they make

> unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 2 (emphasis in original). Improper exclusion of even one juror on *Witherspoon* grounds removes from the state the power to impose the death penalty. As stated in *Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976),

> Unless a venireman is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 2, [*Witherspoon*], he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand.

■ In determining whether an unequivocal belief against the penalty has been expressed, we have held that "[o]nly the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds." *Burns v. Estelle,* 592 F.2d 1297, 1300 (5th Cir.1979), *affirmed,* 626 F.2d 396, 398 (5th Cir.1980) (en banc). The trial court must ascertain that the venireperson who opposes capital punishment can put aside his personal convictions against the sanction and "do his duty" as a juror. *See Witherspoon, supra,* 391 U.S. at 515 n. 7, 88 S.Ct. at 1773 n. 7. Thus, in *Burns* we held that the trial court could not, without further question-

ing, exclude a juror merely because she admitted that the death penalty would "affect" her deliberations at the guilt/innocence phase of trial "on any issue of fact," 626 F.2d at 397–98 & n. 2, and we noted that even a "fixed opinion against" the death penalty was not per se disqualifying, 592 F.2d at 1299. Similarly, in *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870, 875 (1982), a venireman's responses that he did not "think" he could vote for the death penalty, and did not "feel like he could take life in that manner" were insufficient to constitute a resolve to vote automatically against the imposition of capital punishment. 655 F.2d at 677. When there remains any ambiguity about the juror's unequivocal rejection of the penalty, further questioning is necessary to determine whether the juror could put aside his opposition. *Burns,* 626 F.2d at 398.

In *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982) (en banc), we noted that on federal habeas review "[c]lose scrutiny of the voir dire examination of each juror" whose exclusion is now challenged is warranted, 679 F.2d at 384, to determine whether "the stiff requirements of *Witherspoon* and its progeny", 679 F.2d at 386, are met.

In *Williams, supra,* an excused juror had initially indicated mere uncertainty as to whether she could return a verdict requiring the death penalty, and had equivocated in her response to a question as to whether she could *ever* return such a verdict. Nevertheless, on examining these responses in the context of the entire voir dire examination of the juror, the en banc majority concluded that "automatic opposition to the death penalty [was] established," despite these uncertain and equivocating responses, when they were "viewed in conjunction with [the juror's] previous statement of clear opposition to the death penalty." 679 F.2d at 385. In reviewing whether the juror could in the light of her entire voir dire examination be determined to be merely equivocal or vacillating with regard to the death penalty (rather than unalterably

opposed to it), the en banc majority rejected the contention that under *Witherspoon* "exclusion of a venireman is impermissible unless he states in response to *all* questions that he absolutely refused to consider the death penalty". 679 F.2d at 386 (emphasis added). In affirming the exclusion of the juror, the court concluded

> *Witherspoon* and its progeny do not mandate that a prospective juror aver that she would refuse to consider the death penalty in every case that could possibly arise. If she knows enough about the case to know that she could not consider imposition of the death penalty regardless of what evidence might be presented, she must be excused.

679 F.2d at 385–86. *See also Bell v. Watkins,* 692 F.2d 999, 1007–08 (5th Cir.1982).

We have closely scrutinized in the light of the above principles the voir dire examination of each of the six prospective jurors alleged to have been excluded in violation of *Witherspoon.* We will not reiterate the details of each juror's examination, since those are accurately summarized by the Texas Court of Criminal Appeals in its thorough analysis, *Porter v. State, supra,* 623 S.W.2d at 377–79, as well as by the district court in its memorandum opinion denying federal habeas relief. In each case, the prospective juror on direct examination had emphatically and unequivocally stated a refusal to vote for a verdict that would result in the death penalty. In his cross-examination of the juror, defense counsel properly sought to show that the juror could put aside his personal convictions and do his duty as a juror, and thus was qualified to serve in this capital case. On the basis of the respective jurors' responses to these (mostly) general questions as to a willingness to do his duty, Porter argues that these jurors were merely vacillating and equivocal and were not shown to be irrevocably opposed to voting for a verdict that would require the death penalty in this case.

■ Despite Porter's not unforceful arguments, we find no error in the previous courts' determinations that, based upon the voir dire examination of each juror as a whole, the state trial judge properly excused for cause each of the six jurors because he or she was shown to be irrevocably committed to vote against imposing the death penalty in the prosecution against Porter then under way.

On the present appeal, Porter particularly emphasized the alleged *Witherspoon* violations in the excusing for cause the prospective jurors Herndon and Rice.

On prosecution direct examination, the juror Herndon repeatedly expressed longstanding convictions against the death penalty that would require her to vote automatically against the death penalty no matter what the trial revealed. On defense cross-examination, she replied to the first two questions by stating that there was no way for the defense counsel to have her agree that the death penalty was possible in any case. The third and final defense question was to ask her if she could put her convictions aside and do her duty "as a *Juror in a Capital Murder case.*" She replied, "Yes, I could do my duty as a *Juror.*" The defense counsel then rested. The trial court then sustained the challenge for cause. When defense counsel objected, the prosecutor pointed out that the general question asked of doing her duty as a juror had not included "the second predicate question in *Burns....* [that] if it meant sentencing a man to death, could you follow that duty?" Defense counsel did not seek to ask this further question. In view of Herndon's repeated, firm, and unequivocal statements of irrevocable opposition of the death penalty under any circumstances, we are unable to say her limited reply that "she could do her duty as a *juror*" indicated any vacillation or equivocation in her previous statement of unalterable opposition to imposition of the death penalty.

Juror Rice, who had no theoretical objection to the death penalty, testified that she herself, however, could not vote for a death penalty, would exclude the death penalty regardless of what the facts might be, and would be compelled to vote against a verdict that required imposition of the death penalty, and firmly believed she could never

give a death penalty, regardless of the facts. On defense cross-examination, after being asked whether she could set aside her concern and reluctance and "do your duty as a citizen and make whatever decision, based upon the evidence before you that the law might require?", the prospective juror replied, "I really don't know." To a second question whether she knew "for sure one way or the other" whether she could, she replied, "No." The trial court then overruled the challenge. On the prosecutor's contention that the witness's responses to the general questions were insufficient to dilute her previously expressed unalterable opposition to herself voting for the death penalty, the district court permitted the prosecutor redirect examination. This redirect developed (as indicated on the previous direct examination) that Rice irrevocably could not under any circumstances vote for imposition of the death penalty, in her unequivocal replies to the six questions asked on redirect. Her testimony as a whole indicates her irrevocable opposition to her imposition of a death penalty in this case. We find no constitutional error in the trial judge's excusing her for cause and in refusing to permit further cross-examination by the defense of this emphatically and irrevocably convinced juror, as she repeatedly testified.

For similar reasons, we find no *Witherspoon* violation in the excusing for cause the other four jurors, Vaughn, Martinez, Cantu, and Prue. In each case, the prospective juror had reiterated irrevocable commitment against voting to impose a death penalty. In urging that nevertheless the juror vacillated on cross-examination, Por-

ter relies on responses of varying ambiguity that indicated the juror would try to do his duty as a citizen. On redirect, Cantu and Vaughn repeated their irrevocable opposition earlier expressed. On his cross-examination itself as a whole, Martinez reiterated his irrevocable conviction against imposing the death penalty under any circumstances. Prue repeatedly testified on direct to her long-held conviction against capital punishment that would impel her automatically to vote against the assessment of the death penalty, regardless of the facts or evidence; on the defense cross-examination, four questions were asked (three of them eliciting replies of insignificant content), and when a prosecution objection to a fourth question was sustained,[2] defense counsel passed the juror.

## II. *The Competency Psychiatric Examination*

The competency-examination issue in this case arises in the context of the following principles:

■ As a corollary to the principle that the conviction of an accused person while he is legally incompetent offends due process, a trial judge must sua sponte conduct an inquiry into a defendant's mental capacity if the evidence raises a bona fide doubt as to the defendant's competency. The judge's failure to do so constitutes a denial of rights to a fair trial that may invalidate the conviction. *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Lokos v. Capps,* 625 F.2d 1258 (5th Cir.1980).[3]

---

**2.** The trial court sustained a prosecution objection to the question whether the juror could, despite her expressed conviction, set it aside "if chosen on this Jury, and do your duty as a citizen and decide the facts as they were presented to you?" The objection was that the question did not include a reference to the juror doing his duty "knowing the possible punishment is death." Whatever the procedural merits of the ruling, it does not implicate a *Witherspoon* issue in itself. Instead of reframing the question, defense counsel objected to the ruling and terminated his questioning of the proposed juror.

**3.** In *Lokos v. Capps,* 625 F.2d 1258, 1261–62 (5th Cir.1980), we fully summarized the applicable principles:

II. CONSTITUTIONAL GUARANTEES
  A. The Substantive Right
  Constitutional due process requires that trial of an accused may be conducted only when he is legally competent. *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). In *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court wrote that the test for determining defendant's mental competency depends upon:

On the other hand, the statements of an accused ordinarily may not be used against him in either merit-trial or penalty hearing when obtained from him by an examining physician during a court-ordered mental examination for purposes of determining his competency to stand trial or his insanity at the time of the offense, in the absence of waiver of fifth amendment rights against self-incrimination under principles similarly applicable to other custodial interrogations. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Battie v. Estelle,* 655 F.2d 692 (5th Cir. 1981). Furthermore, an accused's sixth amendment right to the assistance of his appointed or retained counsel requires that the accused be afforded "the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what ends the psychiatrist's findings could be employed." *Estelle v. Smith, supra,* 451 U.S. at 471, 101 S.Ct. at 1877.

The competency issue in the present case arose as follows: As noted earlier (*see* note 1 *supra*), in 1976 the defendant had previously been tried for the same offense, but in 1979 his conviction had been reversed by the state appellate court because of the admission into evidence at the penalty hear-

[W]hether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceeding against him. *Id.* at 402, 80 S.Ct. at 789.

One who has been convicted may collaterally attack that conviction by proving his incompetency at the time of the trial by a preponderance of the evidence. He is entitled to an evidentiary hearing for that purpose when he makes a showing by clear and convincing evidence to raise threshold doubt about his competency. *Zapata v. Estelle,* 585 F.2d 750 (5th Cir.1978).

B. The Procedural Guarantee

State procedures must be adequate to insure the right to be tried while competent. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). A court must *sua sponte* conduct an inquiry into a defendant's mental capacity if the evidence raises a bona fide doubt as to the defendant's competency at that time. *Id.; Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

A "*Pate* violation is a procedural error by the trial court and it may occur only in the time frame encompassed by the trial itself and immediately related proceedings.... It is always open for the defendant to later assert his actual incompetence at trial in a subsequent collateral proceeding, but the substantive claim should not be confused with a defendant's procedural rights under *Pate* to a hearing whenever a bona fide doubt as to competence surfaces at trial." *Reese v. Wainright* [*Wainwright*], 600 F.2d 1085, 1093 (5th Cir.1979); *Zapata v. Estelle,* 588 F.2d 1017 (5th Cir.1979).

The habeas corpus petitioner's burden to prevail on a *Pate* violation is different from the one stated above for the substantive claim. The complaint that a *Pate* procedural guarantee was violated is that, in the light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial. *Drope,* 420 U.S. at 174, 95 S.Ct. at 905. The test is an objective one. *Pedrero v. Wainright* [*Wainwright*], 590 F.2d 1383 (5th Cir.1979). The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense. "While the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency procedure, it has focused on three factors that should be considered: the existence of a history of irrational behavior, defendant's demeanor at trial, and a prior medical opinion." *Chenault v. Stynchombe,* 546 F.2d 1191, 1192–93 (5th Cir.1977), *citing Drope,* 420 U.S. at 180, 95 S.Ct. at 908. Even one of these factors, standing alone, may, in appropriate circumstances, be sufficient—"the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope,* 420 U.S. at 180, 95 S.Ct. at 908.

If it is decided in the collateral attack that the original trial court committed a *Pate* violation, the question then becomes whether a hearing can now be adequately held to determine retrospectively the petitioner's competency as of the time of his trial. If the state does not convince the court that the tools of rational decision are now available, the writ should be granted. If a meaningful hearing can be held nunc pro tunc, then it proceeds with petitioner bearing the burden of proving his incompetency by a preponderance of the evidence. *Martin v. Estelle,* 546 F.2d 177 (5th Cir.1977); *Lee v. Alabama,* 386 F.2d 97 (5th Cir.1967).

ing of unauthenticated hearsay statements in a 1973 probation report that, inter alia, referred to Porter's "psychopathic personality" and the "indications of paranoid schizophrenic behaviour" in his conduct. In the second (or present re-)trial, after the jury was selected and just before it was empanelled, the prosecutor discovered information as to a psychiatric episode in the accused's early life (to be quoted below) that he brought to the attention of defense counsel. Tr. 1633–36. There is little question, as the state courts found, but that this was the earliest knowledge the prosecutor had of the information, which he discovered in a search of miscellaneous records, at the request of the accused's defense counsel, for documents unrelated to the present issue.

The jury was then sworn and the first day of trial concluded with the testimony of six witnesses for the State. Before testimony commenced the next morning, out of the presence of the jury, the defendant's counsel stated to the court that he had become concerned about "the report that was brought to our attention" concerning the psychiatric problems of the accused and that he wanted a psychiatric examination, but "only if I can have a ruling from the Court that whatever the results of that examination, that it cannot be used in any hearing on punishment", because in a "Capital Murder" case "if a psychiatrist is called in for an examination, there is a possibility that ... you are developing evidence for the use of the prosecution in the hearing on punishment if the case gets that far." Tr. 1863.

The state objected to this limitation, although conceding that "the way the case law is that both Court and the defense counsel should have him examined." Tr. 1865. In response to the prosecutor's argument, the trial court ruled, "I don't follow what you are saying, but I will deny the request [for a limitation upon use of the examination]. If you [defense counsel] want to let it [the examination report] be the record of the Court and used by either side, I will let him be examined." Tr. 1866. Defense counsel refused the offer of the examination "if the Court is not going to

limit the findings of the doctor to the issues as to his present competency to stand trial or his insanity at the time of the crime." Id.

Porter's counsel persuasively argues that under *Pate v. Robinson* and *Estelle v. Smith, supra,* the district court's ruling refusing to limit the use of the psychiatric examination was erroneous. Where there is a bona fide doubt as to the accused's competency to stand trial and the trial court is therefore under a duty to order a mental examination, *Pate v. Robinson, supra,* the trial court cannot compel him (it is argued) to choose between his constitutional right in that regard and his constitutional right to the assistance of counsel "in making the significant decision of whether to submit to the examination and to what ends the psychiatrist's findings [may] be employed." *Estelle v. Smith, supra,* 451 U.S. at 471, 101 S.Ct. at 1877. As with the fifth-amendment-based prohibition against use against an accused in a merit trial of his testimony in a suppression hearing in support of his fourth amendment right against unlawful seizures, it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968).

■ The flaw in Porter's argument, as we see it, is that, under the present facts, the showing before the trial judge did not trigger any constitutional duty upon him to order a psychiatric examination, because the showing did not raise a bona fide doubt under the circumstances as to the defendant's competency to stand trial. The mere circumstance that an accused is afflicted with some mental deficiency or that he has in his past been afflicted with psychoses does not necessarily implicate incompetency for trial purposes. The test of competency to stand trial "'must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky v.*

*United States,* 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). Thus, if there is no bona fide doubt as to the accused's competency in that respect, the state trial court's refusal to limit use of the psychiatric examination requested by the defendant does not—even if this refusal is deemed to be erroneous—constitute prejudice to the federal constitutional rights of the accused. Only a bona fide doubt as to competency triggers the due process right to further inquiry that might justify federal habeas relief.

Before discussing the context in which the defendant's request for a psychiatric examination on grounds of competency was made, we note preliminarily that Porter does not assert any actual incompetency during trial. Here, he asserts only a violation of the *Pate-Drope* "procedural rules designed to detect incompetence and insure a fair trial", *Reese v. Wainwright,* 600 F.2d 1085, 1093 (5th Cir.1979). As to that issue, the test is whether, "in the light of what was then known, the failure to make further inquiry into petitioner's competency to stand trial, denied him a fair trial." *Drope v. Missouri,* 420 U.S. at 174, 95 S.Ct. at 896.

The defense counsel's concern about the possible need for a competency examination was expressed as being based upon an earlier psychiatric problem of the defendant as revealed by the 1959 probation report that the prosecutor had furnished him the previous day during this 1979 trial. Before noting the contents of that report, it may be well to summarize the context in which it came to light.

Porter has been first tried in 1976 before the same state trial judge, and he had testified before him on a pretrial hearing and at the trial on the merits, during which the judge had the opportunity to observe him and evaluate his competency and his conduct during the entire trial in connection with his lawyer's representation of him. The present appellate record was supple-

mented with Porter's testimony in his appearances as a witness in the earlier trial, and his testimony appears coherent, articulate, and a straightforward presentation of his defense (an accident rather than an intentional shooting), with capable responses on cross-examination. No claim is made that he acted irrationally either at the first trial or the second. If the question of his incompetency was raised at the first trial,[4] it was resolved against him. Despite the circumstance that the appellate opinion reversing the conviction at the first trial expressly referred to the report of "unnamed psychologists" that Porter had a " 'psychopathic personality' and 'indications of paranoid schizophrenic behavior' ", *Porter v. State,* 578 S.W.2d 742, 744 (Tex.Cr.App. 1979), his attorneys representing him on the remand (one of whom, Anderson, had also represented him on the first trial) did not request any psychiatric examination in the months before the second trial commenced. They did so, on the second day of the trial (after sitting with him for at least seven days of voir dire examination), only on the basis of concerns allegedly arising from a statement contained in a probation officer's pre-sentence report of August 13, 1959.[5]

This 1959 pre-sentence report was in connection with the defendant's conviction on a burglary charge at the age of 17. (Porter was born December 12, 1941.) Its six pages rather fully describe the young offender's social history and past brushes with the law. In the seven lines of "medical history", the report contains the statement relied upon at the trial as triggering a need for further psychiatric examination: "The defendant was sent to the State Hospital at Austin, Texas from Gainesville State School for boys, because he had hallucinations of seeing his father and speaking to him." Exhibit 35–A, p. 5. The report had earlier stated that, for robbery and burglary offenses when about 15 years old, the defendant had been sent to Gainesville School for boys in 1957 and "later sent for one month

---

4. In the present trial, the judge referred to the earlier trial at Fort Worth and that the attorneys had instructed Porter not to talk to the psychiatrist. Tr. 1864.

5. This was introduced in evidence at the penalty hearing. *See* State Exhibit 35–A, Tr. 2424.

at the State Hospital at Austin, Texas, from where the defendant escaped." *Id.*

The defendant was 37 years old at the time of the (second) trial. The mental disturbance noted had thus occurred some 22 years earlier. Despite the more recent (1973) psychologists' references to Porter's "psychopathic personality" and "paranoid schizophrenic behaviour", previous to receipt of the report of this 1957 incident, neither his own counsel—with the opportunity to work with him and to observe his demeanor and cooperation with them—had seen fit to raise any question as to Porter's rational and factual understanding of the proceeding against him nor as to his ability to consult with rational understanding with them in the preparation of his defense (the test of competency).

Likewise, and perhaps more pertinently, the trial judge extensively observed Porter and his ability to testify and to cooperate with his counsel during the first 1976 trial, and had observed Porter during the days of voir dire at the second trial. The trial court was thereby shown no reason to doubt Porter's competency, sharing Porter's lawyers' apparent belief that their client, despite his psychopathic personality, was fully competent to understand the proceedings against him and to consult with counsel in the preparation of his defense. In the context of this background, no bona fide doubt as to Porter's competency could reasonably be raised merely because of the recently-learned information that Porter, now 37, had been hospitalized in a mental hospital at the age of 15 for a month because he had hallucinations of seeing and talking to his dead father.

"[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion *on competence to stand trial* are all relevant in determining whether further inquiry [as to competency] is required." *Drope v. Missouri, supra,* 420 U.S. at 180, 95 S.Ct. at 908 (emphasis added). It is true that "even one of these factors standing alone may, in some circumstances, be sufficient." *Id.* Here, however, the 1957 episode does not in our opinion, either by itself or in combination with the later diagnoses of Porter's psychological problems, raise any bona fide doubt that he was incompetent when viewed, as would the trial judge, in the context of an extended period of observation during which Porter had shown himself to be fully competent and fully able to assist his counsel in his defense.

■ This court has stated that the test as to whether a *Pate-Drope* duty of further inquiry arises is: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense?" *Lokos v. Capps, supra,* 625 F.2d at 1261. For the reasons above-stated, our review of the record requires us to agree with the federal district court and the Texas courts' *Porter v. State, supra,* 623 S.W.2d at 380–81, that this determinative question must be answered in the negative, and that the trial judge's failure to conduct further inquiry into incompetency was not constitutionally deficient under *Pate* or *Drope.*

The petitioner Porter nevertheless argues that the rejection of his constitutional claim on this basis is improper, because the state trial judge did not deny Porter a competency examination on such basis but, rather, because Porter's counsel refused to consent to its (possible) misuse against him in the penalty hearing. Porter also points out that the state conceded the need for a competency examination under existing law, so that *if* Porter had other showing to make (none has been suggested, however), the state's concession deprived him of that opportunity.

Examination of the state trial judge's ruling and the colloquy preceding it does not indicate any agreement on his part that further psychiatric examination was indicated, merely a willingness to order one if the defendant requested one and an unwillingness to issue an order at that time as to its hypothetical future use in the penalty

proceeding. Neither in the original federal habeas petition, *see* R.I, p. 54 at 61–62, nor at any other stage in the present state prosecution, post-conviction review, or federal habeas proceedings, has the contention been made that Porter was in fact incompetent to stand trial—the complaint made is limited to whether the trial judge improperly inhibited Porter's *Pate-Drope* right to further inquiry as to his competency by refusing to order a competency examination subject to its non-use in the penalty proceedings. For purposes of federal habeas review, however, the predicate issue for affording Porter habeas relief depends upon whether the record as known to the trial judge raised a bona fide doubt as to Porter's competency so as to implicate constitutional rights to a fair trial under *Pate-Drope* principles. For the reasons stated, no such predicate constitutional deficiency is shown in Porter's state trial, and we are unwilling to agree that the state's mistaken concession as to the need for a competency examination somehow created constitutional error where none is shown.

### III.  *Evidentiary Objections*

Porter seeks federal habeas relief on the basis of the introduction, over his objection, of the following evidence at the guilt-innocence phase of the trial: *A.* the eyewitness testimony of a victim of an armed robbery, and *B.* his oral confession of "the murder" of the police officer. He asserts that both instances of testimony were so prejudicial and inflammatory that he was denied the "fundamentally fair trial" guaranteed by the due process clause of the fourteenth amendment.

To help understand Porter's contentions of gross prejudice, we briefly recapitulate the factual basis and the central issue of the prosecution and defense:

Porter was indicted and on trial for capital murder. The death of the victim, a Fort Worth police officer, resulted from the officer's stop of a vehicle driven by Porter in connection with his reported involvement in recent robberies. The charge of *capital* murder against Porter required proof that he had knowingly and intentionally killed a peace officer who was acting in the lawful discharge of an official duty. Tex.Penal Code Ann. § 19.03(a)(1) (Vern.1974). Porter's defense was that his shooting of the officer was unintentional and had occurred in a struggle as he was attempting to escape, after first being shot by the officer without provocation, when Porter's own weapon accidentally discharged.[6] The main thrust of this defense was to escape the capital-penalty consequences of an *intentional* shooting of a police officer acting lawfully—so as to be subject instead, at most, to conviction of the *non*-capital homicide and assault offenses permitted as responsive verdicts to the indictment for capital murder.

### A.  *Introduction of an Extrinsic Offense*

Porter claims that he was denied due process in the conduct of the guilt-innocence phase of the trial for the shooting of the police officer because the trial court permitted the State to introduce eyewitness testimony of a victim of an aggravated robbery committed by Porter eleven days before the shooting. The prosecution sought to prove the defendant's motive for killing the policeman: Porter's escape from apprehension that would lead to arrest for the robbery. The defense offered to stipulate as to the fact of the robbery to establish Porter's flight motive; the defense objected to the eyewitness details of the robbery being presented to the jury. The court limited the State to presenting evidence of only one of the several robberies Porter had allegedly committed before the shooting, and provided a limiting instruction with respect to the testimony. In admitting the evidence, however, the district

---

**6.** This defense was presented by Porter's own testimony at the first trial, the conviction that was reversed. *See* note 1 *supra*. Porter did not testify at the present retrial, but this defense was advanced based upon a written statement he had given the police shortly after his arrest and upon deductions attempted to be drawn from circumstantial evidence and the testimony of a bystander.

court outside the presence of the jury admitted it to prove "motive, malice, and intent." See prosecution trial brief, Tr. 56–61. The prosecutor referred to the victim's testimony several times during closing arguments.

The effect of the admission of this extraneous defense and its details, Porter argues, was not only to permit proof of motive, proper under state law, but also to permit the jury from this testimony to infer that Porter intended to kill the policeman, as argued by the prosecutor.

Susan Chandler, the robbery victim, testified before the jury (again, over defense objection, Tr. 2317) that the defendant had robbed at gunpoint the cash register of the store where she worked, then led her to the store room, where she was "struck from behind. At some point thereafter, two to five minutes, I regained consciousness. I was lying in quite a bit of my own blood." (Tr. 2320). There were "two lacerations" on the back of her head that were "fairly deep." (Tr. 2322). The defense had no questions on cross; it renewed the objection to the entire testimony, asked for a mistrial, and then a limiting instruction (Tr. 2324–25). Chandler was the State's last witness, and the defense did not put on any witnesses.

The limiting instruction subsequently given to the jury was:

> You are further instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the intent and motive of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment, and for no other purpose.

No objection was made to this instruction as given.

The prosecutor referred repeatedly to the Chandler beating in his closing argument, Tr. 2334, 2337–38, 2352, 2402, 2404, 2413–14, again without objection (except once that his argument that "what if Chandler had been shot" was "outside the record", Tr. 2402).

In its brief to the Texas Court of Criminal Appeals, the defense objected to the admission of Chandler's testimony on the grounds that (1) a showing of motive—in this case Porter's desire to flee apprehension for the prior robberies—is not a *necessary* element of the crimes for which he was charged (supposedly, a requirement before admission), so that extraneous offense evidence should not have been permitted; (2) intent could be inferred from the shooting itself, and the robbery could not show Porter's intent to *kill* the policeman; and (3) the prejudicial value of the evidence far outweighed its probative value, if any. The defense did not mention its attempt to stipulate as to Porter's involvement in the robbery, or the inflammatory nature of the prosecution's closing arguments. The Court of Criminal Appeals ruled that the evidence of an extraneous offense was permissible to show motive because motive is relevant as a circumstance in determining the commission of an offense, *Porter v. State, supra,* 623 S.W.2d at 385–86; here, Porter's motive to avoid apprehension.

On this habeas appeal, Porter asks us to consider that the evidence, not necessary to the State's case, was inflammatory and highly prejudicial to Porter's guilt and innocence trial. Porter characterizes the admission of this evidence for purposes of proving intent as a violation of Texas law and a federal due process violation due to its significance to the conduct of a fundamentally fair trial. He argues that the trial court did not weigh the prejudicial and probative value of the live-witness testimony and had no reason to reject the proffered stipulation for the purpose of proving Porter's motive for the shooting without the prejudicial details of the incident to which the witness testified. On his present habeas appeal, Porter refers to, but does not expressly

attack, the prosecution's use of the testimony.

At this point, we summarize: The admission of the extrinsic offense was clearly proper under state law to prove motive. While it might be preferable if state law permitted a stipulation of the limited fact (the prior robbery) for which the proof was relevant instead of the full details, cf. *United States v. Webb,* 625 F.2d 709, 710 (5th Cir.1980), we are aware of no federal constitutional requirement that the prejudicial effect of admissible relevant testimony be so minimized. However, the extrinsic offense was arguably inadmissible under state law to prove the accused's *intent,*[7] and Porter raised this point as part of his assignment of error that the extrinsic offense was improperly admitted—a contention as to which the Texas appellate court made no comment, finding that the offense was admissible to prove motive. *Texas v. Porter, supra,* 623 S.W.2d at 385–86. The prejudicial use of this extrinsic offense with regard to intent was the trial court's instruction to the jury that it could consider it for that purpose and was the prosecutor's repeated reliance upon it for that purpose—as to which no objection was made at trial or on state appellate review on direct appeal.[8]

7. Under Texas state law in effect prior to Texas's adoption of the federal rules of evidence in 1983, evidence of extraneous offenses is permitted under only limited circumstances, to show, *e.g.,* identity, modus operandi, specific intent or lack of a defense, or motive, when these issues are in dispute. *See generally Albrecht v. State,* 486 S.W.2d 97, 99–101 (Tex.Cr. App.1972). The Texas state court is required to compare the probative value of the prior offense with its prejudicial or inflammatory aspects in an ad hoc determination based on the facts of the case. *Ruiz v. State,* 579 S.W.2d 206, 209 (Tex.Cr.App.1979). If "the evidence is offered only to show that the accused has once committed a crime, and [that the defendant] is therefore likely to have committed the principal offense," it is not admissible. *Ford v. State,* 484 S.W.2d 727, 729 (Tex.Cr.App.1972). Erroneous admission of such evidence is rarely considered harmless, unless there exists overwhelmingly certain evidence as to all of the elements of the charged crime independent of the extrinsic offense. *See, e.g., Ruiz v. State,* 579 S.W.2d 206 (Tex.Cr.App.1979); *Powell v. State,* 478 S.W.2d 95, 98 (Tex.Cr.App.1972); *Ford v. State,* 484 S.W.2d 727 (Tex.Cr.App. 1972).

8. In effect, Porter now asks us to consider—as federal constitutional impediments to his right to a fair trial—state trial court errors that he did not raise in state court at either the trial or appellate level. Under Texas procedure, a party's failure to object to the prosecution's statements in closing argument operates to waive his right to complain on appeal. *Sanchez v. State,* 589 S.W.2d 422, 424 (Tex.Cr.App.1979). *See also Bell v. State,* 620 S.W.2d 116, 126 (Tex.Cr.App.1981); *Brock v. State,* 556 S.W.2d 309, 314 (Tex.Cr.App.1977). The grounds of error in the appeal must be similar to the basis of the objection made at trial. *See Smith v. State,* 513 S.W.2d 823, 830 (Tex.Cr.App.1974). Moreover, the defendant waives any possible grounds of error that he does not specify on appeal in a timely fashion. *See, e.g., Bell, supra,* 620 S.W.2d at 126; *Hawkins v. State,* 613 S.W.2d 720, 723 (Tex.Cr.App.1981).

The state appeals court may, however, examine an unassigned error or one made in an untimely or improper fashion if it should be reviewed "in the interest of justice." Tex.Code Ann.Crim.Pro. art. 40.09(9), (13) (Vern.1979). The Texas courts have exercised its discretionary review under this provision for errors of state and statutory federal constitutional magnitude such as double jeopardy, *see Tatum v. State,* 534 S.W.2d 678, 680 (Tex.Cr.App.1976), a fundamentally defective indictment, *see Zachery v. State,* 552 S.W.2d 136 (Tex.Cr.App. 1977), the trial court's assessment of a greater punishment after conviction on retrial, *see Lechuga v. State,* 532 S.W.2d 581, 582 (Tex.Cr. App.1975). The courts have expressly denied discretionary review of an unassigned error regarding admission of extrinsic offense evidence that was objected to at trial on grounds different from those specified at trial. *See Bell, supra.* Cf. *Felder v. State,* 564 S.W.2d 776, 778 (Tex.Cr.App.1978) (en banc) (properly preserved objection to act of alleged prosecutorial misconduct not correctly presented on appeal nonetheless considered by the court in the interest of justice).

In this case, Porter did not object to the prosecutor's closing argument, nor to the instruction to the jury that it could consider the eyewitness extrinsic offense testimony as evidence of *intent* as well as motive. The defendant did not raise these points on state direct appeal in his original brief, so that they, and the argument that the trial court should have permitted a stipulation as to the extrinsic offense constituting motive rather than admitting potentially prejudicial testimony from the victim, would under state law be waived as new grounds of error not raised in the original brief. These objections, raised for the first time before *this* court on federal habeas review, could not properly be presented to the state court for appellate review. *See Coleman v. Texas,* 632

[6] Although we as a state appellate court might on review have found the use of the extrinsic-offense evidence to constitute error under state law (see notes 7 and 8 *supra*), our function as a federal habeas court is limited. "We have repeatedly admonished that we do not sit as a super state supreme court on a habeas corpus proceeding to review error under state law." *Mendiola v. Estelle*, 635 F.2d 487, 491 (5th Cir. 1981), quoting *Cronnon v. Alabama*, 587 F.2d 246, 251 (5th Cir.), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). Even the admission of evidence that is erroneous under state law does not entitle a convicted person federal habeas relief unless the evidentiary ruling has resulted in "a denial of fundamental fairness" under the due process clause. *Id.* Even the erroneous admission of prejudicial evidence can justify habeas relief only if it is "material in the sense of a crucial, critical highly significant factor." *Anderson v. Maggio*, 555 F.2d 447, 451 (5th Cir.1977) (quoting *Hills v. Henderson*, 529 F.2d 397) (5th Cir. 1976), *cert. denied sub. nom Hills v. Maggio*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976)).

In the present instance, the extrinsic offense was properly admitted as relevant to motive, although (only) arguably the trial jury was improperly instructed and the prosecutor improperly argued (both without objection by counsel shown by the record to be diligent and able) that the jury could likewise consider this evidence on the question of intent. The present contention is thus distinguishable from that in *Bryson v. State of Alabama*, 634 F.2d 862 (5th Cir. 1981), where federal habeas relief was afforded, and where the admission of the extrinsic offense was concededly erroneous under state law, and the error for which federal habeas relief was sought had been timely asserted in the state proceedings.

[7] Under the circumstances here presented, we are unable to say that the extrinsic-offense error complained of, if error it was, was of "constitutional proportion" so as to violate due process and to justify federal habeas relief. *Reese v. Wainwright*, 600 F.2d 1085, 1090 (5th Cir. 1979). *See also Woods v. Estelle*, 547 F.2d 269 (5th Cir.1977); *Anderson v. Maggio*, supra, 555 F.2d at 451; *Hills v. Henderson*, supra, 529 F.2d at 401. Porter has failed to establish that the evidence in question was inadmissible and that its unobjected-to prejudicial misuse was so fundamentally unfair as to constitute a denial of due process at the state trial. Accordingly, his extrinsic-offense claim does not entitle him to federal habeas relief.

### B. Introduction of an Oral Confession

Porter had been arrested two days after the shooting of the victim. During the arrest, Police Officer Hathorne discovered three letters addressed to two newspaper editors and an attorney, that Porter identified as his writing and gave the officer permission to read. No issue is now raised as to the admissibility of the letters themselves. The evidentiary objection now relied upon arose in connection with the admission of Officer Hathorne's testimony as to his contemporaneous notes of his conversation with Porter shortly after Porter's arrest.[9]

S.W.2d 616, 618 (Tex.Cr.App.1982). By these procedural defaults under state law, and in the absence of allegation as to justifying cause therefor, federal habeas review of the prejudicial use of the admissible extrinsic-offense evidence may be barred. *Mendiola v. Estelle*, 635 F.2d 487, 490 (5th Cir.1981).

The issue Porter actually preserved and presented to the state court—that extrinsic-offense evidence may not be presented to show motive, because motive is not a necessary element of capital murder—was properly rejected on state appeal, *see Porter*, 623 S.W.2d at 385–86, under appropriate Texas jurisprudence.

**9.** The district court found that Porter did not allege that the statement was used in violation of any federal right, and thus found there was no issue for federal habeas review. Porter contends, however, that the violation of the state evidentiary rule resulted in introduction of prejudicial evidence and deprivation of his federal due process right to a fundamentally fair trial.

Porter's letters were identical and contained the statement: "This is my confession in the death of the Fort Worth Police Officer which no one was involved in but myself ... my brother-in-law had nothing to do with the death or anything else that I have done...." (In a

Officer Hathorne's notes as to his conversation with Porter concerning these letters, which over the defendant's objection he was permitted to read to the jury, stated as follows: "This officer asked Henry Porter, Jr. if these were his letters and he stated that they were and that they would clear his brother-in-law of any involvement on the murder in Fort Worth. He also stated that they contained his confession in the murder of the police officer." Porter contends that these statements were introduced in violation of the Texas evidentiary rule which bars admission of evidence of an oral confession unless the statement leads to the discovery of evidence tending to establish the defendant's guilt.[10]

The Texas criminal appeals court found that Hathorne's account of Porter's oral confession was admissible because it contained the same information that appeared in the inculpatory letters. 623 S.W.2d at 382. *See Brantley v. State,* 522 S.W.2d 519, 524 (Tex.Cr.App.1975); *Gutierrez v. State,* 502 S.W.2d 746, 749 (Tex.Cr.App.1975) (oral confessions admissible if they "contained in detail the same information" as a written statement). Porter argues before us that Hathorne's statement that he confessed to the "murder" of the deceased is not identical to the written confession that referred to the "death" or "shooting" of the police officer. A confession of "murder", Porter urges, is directly contradictory to his post-arrest written confession in which he admitted to shooting the police officer, but by accident or in self-defense, and was grossly prejudicial to his defense of accidental rather than intentional shooting.

In finding no error, the Texas court apparently rejected the distinction Porter makes between the characterizations of "causing death" and "murder". We find that the admission of Hathorne's version of the oral confession does not entitle Porter to habeas relief, because it did not constitute either a violation of an applicable state statute or a denial of a fundamentally fair trial as required by the due process clause of the fourteenth amendment.[11] When there was no question as to whether Porter was responsible for the shooting and death of the police officer, the difference in terminology between the oral and written confessions that may have been of no consequence to a layman untrained in the law, is not "material in the sense of a crucial, critical highly significant factor," so as to implicate a denial of due process fair-trial rights. *Anderson v. Maggio,* 555 F.2d 447, 451 (5th Cir.1977).

## IV. *The Prosecutor's Alleged Comment Upon the Accused's Failure to Testify*

Porter finally argues that the prosecutor violated his fifth amendment rights against self-incrimination by stating in closing argument that Porter's post-arrest, signed exculpatory statement was "not sworn" and "not made under oath." Porter contends that these references impermissibly commented on his failure to testify on his own behalf, and thus constituted constitutionally prejudicial error under *Griffin v. California,* 380 U.S. 609, 613, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965).

---

written statement, dated the day after his arrest, Porter again admitted shooting the police officer, but in a struggle over his gun after Porter himself was shot in the side.)

**10.** This rule, Tex.Code Crim.Proc. art. 38.22 (1967), provides:

    1. The oral or written confession of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible if:

    ... (e) It be made orally and the defendant makes a statement of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of

secreted or stolen property, or the instrument with which he states the offense was committed.

**11.** Nor was Texas courts' treatment of the oral confession so irrational and discriminatory that it violated the fourteenth amendment's equal protection clause. The evidence was relevant in establishing Porter's involvement in the killing, as were the written confessions, and as we discuss above, Hathorne's statement that Porter confessed to "murder" did not unduly prejudice the defendant before a lay jury so as to constitute "discrimination."

We find, as did the federal district court in denying habeas relief, that these statements were not "manifestly intended or [were] not of such character that a jury would naturally and necessarily take them to be a comment on the failure of the accused to testify." *United States v. Wilson,* 500 F.2d 715, 721 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). *See also United States v. Sorzano,* 602 F.2d 1201, 1202 (5th Cir. 1979) *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1982). We reject Porter's contention that the prosecution's statements—indicating the weight to be accorded out-of-court, unsworn statements—challenged the defendant's refusal to take the oath and "testify," and thereby called attention to his silence. *Cf. Davis v. United States,* 357 F.2d 438, 440–41 (5th Cir.), *cert. denied,* 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966) (infringement of right to remain silent where trial court ruled that the defense counsel could not impeach the prosecution's witness directly, but instead urged the defense to "put your people" on the stand to challenge that testimony).

Porter also characterizes this situation as one similar to that in which the prosecution impermissibly refers to the evidence as "uncontradicted" when only the non-testifying defendant is in a position to dispute the unchallenged evidence. *See, e.g., Davis, supra,* 357 F.2d at 440–41; *see also United States v. Jennings,* 527 F.2d 862, 871 (5th Cir.1976). Porter's somewhat attenuated argument is that, since no one but Porter could affirm or contradict the events set forth in the written exculpatory statement, the prosecution improperly emphasized Porter's failure to testify facts about which only he was directly knowledgeable. We reject this contention. By the remarks, the prosecutor did not directly assert or imply that proof of guilt was uncontradicted due to Porter's failure to produce sworn testimony. Rather, the focus of the prosecutor's remarks concerning the "unsworn" nature of the statement was to question its reliability at the time of its confection, where Porter relied upon the exculpatory statements therein made by himself after his arrest to establish his claim of self-defense or accident.

Because the prosecution's statements did not reflect directly or indirectly on the defendant's decision not to testify, we conclude that these statements did not result in violation of Porter's fifth amendment rights not to take the stand.

*Conclusion*

On the basis of the contentions made, we are unable to find that the state criminal proceedings leading to the petitioner Porter's conviction and sentence to death were infected with errors of constitutional dimension that entitle him to an evidentiary hearing or to general habeas relief. Accordingly, we AFFIRM the judgment of the district court that dismissed his petition for federal habeas review.

AFFIRMED.